Thank you. Please be seated. The third case on our docket this morning is 22-30382, and I'm not sure that I can properly pronounce it. Is it Bommarito v. Belle Chasse Marine Transportation? Mr. Duvall? Good morning, Your Honors. We're here today as the appellants in the decision of the district court, which was result-oriented. It's an example of cherry-picking facts to place a defendant who was only liable under the Longshore Act liable beyond that. Result-oriented in finding jurisdiction and holding my clients 100% liable for the intentional and criminal acts of Mr. Bommarito and a third-party drug dealer. For the district court to find jurisdiction, as it said in its opinion, it had to find a piece of the vessel defective. In finding that piece defective, it said a hook needed a latch. And beyond that, it said the reason why it was defective needed the latch because absent the latch, it required Mr. Bommarito to stand there and hold the rigging except what the judge ignored, and he specifically found that Mr. Bommarito was holding the straps when the accidents happened. That's finding of fact number 15. However, the only eyewitness to the accident on record document, record on appeal 2594, said, if you look at the questioning, did he give you the hand signal to stop? Yes, he did, meaning his hands were free. Or a hand, right? Did you stop? It could have been one hand, right? Could have been one hand, but he goes further. Did you stop? Yes, sir. How many seconds between the time you stopped and the time the accident happened? How long? How long between? Almost a whole second. So there was a period of time he had time to move out of the way. Yeah, he was on his way, moving out of the way, when it happened. There was no evidence that he was holding, presented in a cart, that he was actually holding the straps. An example of the judge ignoring facts. Did you say when you were reading, you said almost a whole second, is what he said? Yes, almost a whole second. After a hand signal. That's part of what's on appeal here is that finding and also the finding that the latch itself was defective. So under the law of the circuit, the latch has to be defective and it also has to be a cause of the accident. Okay? Just a latch being defective by itself doesn't give the court jurisdiction. And you see that case, the lower court case that I've relied upon in Delosia, where there was a vessel involved that actually struck someone, but because it wasn't defective, there was no jurisdiction. The finding of a defective, that the latch was defective, the court, one, improperly found that he was standing there, right, when there was no evidence in the record that he was holding the straps. Next you move to the testimony regarding the hooks. If you look at the record, the record's clear. The man, the company man who designed the hooks and implemented how they were supposed to be used said, my two guys were not using the hooks correctly at the time. If I would have seen what they were doing, I would have stopped them. I designed the hooks to be used a specific way. They knew that. They weren't following it. So it was to the question, what was really the issue that day? It wasn't the hooks. It was the means and methods, right? And under the Fifth Circuit, an employer, under the LHWCA, can't be liable as a negligence for the means and methods. The court further ignored testimony from the plaintiff's own expert that this accident could have happened with the hooks that he was suggesting should have been alternately used. Record on appeal 3031, their expert said, you could have used the procedure that the defense expert used in their video where it clearly shows that if it's just laying on the grating, it will self-hook. Again, it goes back, how are these hooks defective? It goes back to the means and methods. If they would have been using the hooks properly, the accident wouldn't have happened. The supervisor even said, had I seen that, I would have stopped them. Unless there's any questions on the hooks, I'll go to the next issue. The next issue would be how the court found two defendants, Belchase Land and Belchase Marine.  and Belchase Marine was the defendant. Belchase Marine owned the vessel. Land was the land side construction crew, employed the land side construction crew. So the court fused these two companies together so it didn't have to get a result, to hold land liable beyond the LHWCA. In doing so, what's devoid in his opinion is what case law he relied upon to fuse these companies. He didn't say Louisiana law. He didn't say federal law. And if we assume, because the court had assumed it had jurisdiction, that it was using federal law, then what case did it cite? What factors did it use? There's nothing to tell us how it weighed any facts. Not one case was cited. And probably the most important portion of our appeal today is the public policy that the court set. In its opinion, that Belchase Land, the employer, was 100% liable for the criminal acts of a plaintiff and a third-party drug dealer. In preparing for today, I realized that looking at CNN, New York Times, that what Mr. Bomarito had taken that day is a hot-button issue. It's all over the news. I didn't even know that Xylazine had a nickname, Trank. Which is what he was using at the time. He was using a fentanyl Xylazine cocktail. When you say that's what he was using at the time, are you talking about what was prescribed or what he ended up dying from? No. The illegal drugs, street drugs, that he had taken at the time were a concoction of fentanyl and Xylazine, which is neither one he had a prescription for neither drug. Fentanyl and Xylazine can't even be prescribed to humans. It's a horse tranquilizer. So, accepting what the court has done, basically you've shifted 100% of personal responsibility to an employer for an act. This wasn't like he overdosed on prescription opioids or anything his doctor prescribed. He went out on his own, found a drug dealer to get high. And actually that's what the evidence Dr. Troxler testified, that you cut fentanyl with Xylazine to enhance your high. So there was no evidence presented as to why Mr. Bomarito would have actually gone out and gotten these drugs. The judge assumed it was to relieve pain. But there was no testimony. Well, the mother said that he was trying to get a doctor appointment and wasn't able to and he was in pain. So I do think there was some evidence. You're right. A mother said that. However, when you look at the medical, the evidence from his doctors, as of January 28th, his neurosurgeon was going to release him to go back to work in April, had filed a form with the LHW. From the very start he's had some up and down. I mean, from the very start they said just go do some light work. And he had all these issues that hadn't been addressed. So then he's starting to get them addressed. And, you know, it's not unheard of that somebody's getting better and then boom, goes down, gets better a little bit, boom, goes down. That is not unheard of in medical life. Correct. Okay, so that's more of a factual issue for the judge. Well, on the 28th his neurosurgeon said he was doing better and didn't think he needed to keep him on OxyContin anymore and actually said I'm going to give him lesser pain meds. You look at February 28th, a month later, he's at his maxillofacial surgeon, Dr. Dennis. He reports no pain. So in this case you've got a history of a plaintiff. By this time he's already represented, already filed suit. You can't just discount what his mother said. I mean, you're stuck with the facts.  So the facts are what the judge is saying. It's okay to not represent the truth to your medical doctors, but secretly no one else would know that he's in pain except for his mother. That's a jury argument. Well, they tried to get another doctor appointment and weren't able to. That was my understanding. They had one scheduled. They had an appointment scheduled two weeks out. Two weeks out.  Have you ever been through something where you were just in agony and you've got to wait two weeks to deal with that? But wouldn't a reasonable person, though, wouldn't it be reasonable to go to the emergency room? These are fact arguments. Wouldn't it be reasonable to be? Well, the facts are, in this case, instead of seeking help, we have no evidence in the record that he actually took drugs that day for pain. In the record, his mother testified that day he slept well. It's a little hard to get evidence from somebody who's dead. So you have to try to. . . That's why you have the fact finder, which is here the judge, look at all of that and consider what the mother said and so on and so forth. Yes. But the mother said. . . Lomarito cannot testify on his own behalf when he is dead, sadly. I mean, again, nobody's happy that he's dead at all. So that's the point. Just assume there's some evidence. You may not agree with that, but for argument's sake, what would your argument be, assuming there's some evidence he did seek pain relief from illegal drugs? Assuming that's true, what's your response to that? That's an intentional act that's unforeseeable. That's a criminal intentional act that's unforeseeable. And also it's unforeseeable that a drug dealer would mix a concoction so lethal. . . How can an employer be liable for this risk? How can an employer take this kind of risk on with any employee that gets injured at its job? Also, this case goes beyond an employer-employee relationship. You rear-end someone in a car. That person goes out, they're in pain that day, which is a fleeting day of pain because he had reported many days of no pain. So that person who you rear-ended now can go out, commit a crime, and you're liable for the crime? If they go out and obtain drugs, an overdose? So you're saying if we affirm, then it would be creating a situation where everybody's liable for people taking drugs? It could be. . . If they cause an accident? If you cause an accident, if you're a defendant and that person's injured, this is basically saying, yes, you're liable. That person goes out to treat his pain, decides against all medical prescription, against his own doctor's orders, go out and do something illegal, obtain fentanyl. Yes, that is exactly what the holding says. And to find that this defendant is 100% liable for an intentional criminal act, that's also on appeal here. Even if it was reasonably foreseeable, at some point, the plaintiff, or the decedent here, has to be assessed with some liability for his personal actions. He could have easily been charged with a crime, or he could have easily went to an ER, but he chose to go to a drug dealer. The last issue on appeal, to mention before my time runs out, is the award of damages to Ms. Bomarito. As we briefed ad nauseum in our . . . we think it's contrary to Fifth Circuit law on that issue. Unless you have any questions, my time is up. Thank you. Good morning, Your Honor. I may please the Court. John Leslie on behalf of the appellee, here with Mr. de Blas Blanc also on behalf of the appellee. The first thing I take issue with is he said on a number of occasions here, criminal activity, drug dealer, there's no evidence at all in the record where Mr. Bomarito obtained the medication that he took. Well, it's illegal. We know that. We know it's illegal. What difference does it make? They brought the coroner there to establish that there was a pattern of this, that they expected to find all these other drugs in his system, that he was a drug user. I mean, that was their theme through this whole thing. Mr. Bomarito was a 48-year-old man who worked his entire life. He took care of his children. He had a deceased wife from cancer. He was taking care of his family. And unfortunately, he suffered an excruciatingly painful injury to his neck and his face. Let me ask you a hypothetical. Let's suppose that he was in pain. He couldn't wait. It felt like he couldn't wait two weeks to talk to his doctor. So he takes an illegal drug to medicate himself, and it makes him drowsy. He gets behind the wheel of a car and has a one-car accident that kills him. That would be an intervening superseding. Why is that different? Because it's not following in line with what the original injury was. And going back to your original questions, the fact finder listened to the testimony of the doctors, of the coroner, of his mother, reviewed the records, and determined, based on causation, foreseeability, that that's what happened, that this man was in such excruciating pain. My hypothetical, he was in such pain that he took an illegal drug to quell the pain. To quell the pain. He did not realize how impaired he was. He was driving, and he had a car accident that killed him. Now, how is that different? Because it's so far disconnected from. . . It's not disconnected. Well, he did another act. It's something completely irrelevant to just treating the pain. And there's testimony that he was outside talking to the neighbor ten minutes before his parents arrived home and found him dead on the floor. Nobody knows where he got this. We do know it's an illegal substance. I mean, Dr. Tresclair was clear that this combination is something that they sell on the Internet and on the street. And Judge Fallon interjected into the questioning and asked about the medications themselves. That's in the record. He genuinely seemed to understand my position on this. I guess I should know the answer to this. Maybe everybody else does. Is fentanyl illegal? Fentanyl is prescribed. Well, that's what I thought. So there was no fentanyl in what he took? He had been prescribed fentanyl while he was in the hospital during his treatment. No, but what he died from? Was there any fentanyl in what he died from? He died of a combination of fentanyl and xylosine. The xylosine. . . I thought I heard you agreeing to a question that said the drugs were illegal. The combination. . . That cocktail was illegal. Is what they find on the street. It's not an illegal drug, is it? No, it is not. All right. It is prescribed. And he had had a prescription of fentanyl. Now, the case law in looking at these cases where you have a drug overdose either of illegal drugs or taking your mom's pain medications and you OD on it, it all goes to foreseeability and it all. . . Isn't that illegal? So if his mom was getting fentanyl. . . And he took it. . . That is illegal. That would be illegal. Even though it's not an illegal drug per se because it's a prescribed drug. . . Right. The whole notion of prescription drugs is you have to have a prescription. It's not like going and getting aspirin at the Walmart. I don't disagree with you, and I understand this is a very complex and complicated issue, but what they're asking you to do is draw a bright line in the sand and say, if you OD, whether it's you got your mom's prescription or you have a prescription and you OD on it or you get something illegal, that that cuts off any bringing it back to the original incident. And that's not the way to look at this. It's a factual basis. It's a factual issue. You have to look at the facts. And the case that they cited in their brief, Thompson out of Colorado, which was reversed by the Tenth Circuit, brought that exact issue up, said you have to look at this on a case-by-case basis. You can't just, you know, that would mean plaintiffs in the future, if they OD'd because they're in such pain because of an injury they sustained at the hands of somebody else, then. . . Again, case-by-case basis. This is a case where he could not have thought that he was obtaining this drug legally. There's no legal source he could have gotten it from. He couldn't go to the. . . But nobody knows where he got it. Well, we know he didn't get it from any legal prescriber because it didn't exist in any form that he could have gotten in a legal method. He could not have thought this drug was legal. Right, but nobody knows if he even knew what he was taking. He knew he was taking something to handle his pain because he was trying to get another appointment because he had run out of his medication. We know that he could not have obtained it from any legal source. He could not have believed this was legal. That's what I assume. We're assuming it. Wal-Mart, et cetera, right? You don't go and buy something you think is aspirin at Wal-Mart and it turns out to be this. . . Well, we don't even know if he bought it. It doesn't matter. He could not have gotten it from a legal source. Right. Is there any evidence that Wal-Mart, Walgreens, CVS, et cetera, et cetera, are selling things that are called aspirin when actually they're xylosine and fentanyl? Not in this record. Because that's where you could make a mistake thinking you're buying aspirin, you're taking aspirin for your headache, and then boom, you die. That would be something where you didn't realize it was illegal.  There's no evidence of that in this case. Is it foreseeable that he would seek out pain medication to deal with the excruciating pain? I mean, not only did he have the broken neck that wasn't treated properly for a number of weeks, he was still dealing with a fractured orbital and a fracture in his eye. And if you look at Dr. . . . Oh, I definitely think he had a lot of problems. Yeah. I mean, every time he'd look left, right, or up or down, he was scraping against bone, and it was . . . I'm asking a question. What I'm wondering about with the hypo that your opponent made, so if you rear-ended somebody's car and they go, oh, my gosh, that really hurt my back, and they walked down the street and got some fentanyl xylosine or whatever that is and died, are you liable for that death as opposed to merely the damages of the car accident? Well, I think, again, you'd have to look at it on a fact-by-fact basis. If they had been treating for a period of time, for instance, it's not cited in the briefs or anything, it was just a case I came across most recently out of Florida. Two individuals were in a vehicle that side-swiped a car, and they were thrown from the seats of the vehicle and hurt their backs. They started paying medication. One O.D.ed four months later, another one O.D.ed a year later. Now, in that scenario, the van they were in, they were patients at a rehab facility treating them for drug addiction, and they end up O.D.ing on pain medication. So in that case, I don't think you can hold the facility liable for the O.D.s because they're treating them for the exact same thing that happened later on down the road after they got an injury. In this case, you have a 48-year-old man who has no history whatsoever of drug use at all. When he was found dead on the floor, they searched the house. They found no drug paraphernalia. They found nothing in his house to indicate that he ever took anything. And the autopsy revealed that the only thing he had in his system was the fentanyl, the xylosine, and the diazepam that he was prescribed for depression. No alcohol. He had nicotine. But nothing else. What killed him was the illegal drug. I'm sorry? What killed him was the illegal drug. No question about that. And he couldn't have thought it was legal. So we just get back to these are the facts. Exactly. And the judge, in hearing all of the testimony about the type of pain he was in, how long he was in pain, what he was trying to do with dealing with the pain, trying to get another appointment, that it was foreseeable that he would seek out some relief. No other drugs of this kind were found in the house. Nothing. So that's a little odd that he would walk down the street and buy one, you know. We don't know that he bought it. We don't know. Okay, but how would it get in his body if it didn't come? He got it somehow. But it was only the one that was obtained somewhere, apparently. Yes, and according to Dr. Troxler. That's kind of odd because I would think typically if you're not getting your prescription and you're trying to use drugs, wouldn't you buy more than one? I don't know. That's not something I do. Yeah. So I don't really know how it works, but I guess I'm just wondering. But his mother testified that he was dealing with this by taking over-the-counter medication. She was trying to move his appointment up to get additional medication. They still hadn't dealt with the eye injury, which was excruciatingly painful. I mean, Dr. Dennis. What about the fact that his doctor a couple weeks before said, you know, you're doing fine and withheld the prescription? Well, I mean, we don't live in a bubble. I mean, that happens all the time. You're saying it's up and down. Yeah. I mean, people have good days and bad days. I mean, I was in a car crash. I have a back injury. I have good days and bad days, you know. I don't want to take medication, but sometimes I feel like I have to. Don't take the fentanyl. No. I'm scared to death of getting it. I'm scared to death of prescriptions at this point. And to address some of the other things that he touched on, the hook itself, I don't know that this court will have any issue with finding that the Admiralty Extension Act applied and that this was a vessel and that this was an appurtenance to the vessel. I'll address those if you need me to. But this hook that was made by land did not have a latch on it. Our expert, Mr. Borson, testified that in his report states that this hook without the latch was a defective hook, that it shouldn't have had a latch on it. Had it had a latch on it and been used the way that they were using it, our client could have stepped away from it completely. Now, would the metal have failed and the hook flown out? Possibly. But he would not have been standing there having to hold these things to make sure that these hooks. There was an argument that he wasn't doing that, that he had a full second, which I've never known was argued as a long time. But anyway, he had a full second. Well, if you look at their expert's report and you look at the video that is submitted and Mr. Borson's testimony, under perfect conditions, because they keep saying that these hooks were designed to work a certain way and that they worked that way, under perfect conditions, when they did their little experiment and we showed the video, the grating came up off the ground, which is what actually caused this thing to fail, is that he lifted it when he shouldn't have. It was over 800 pounds. That happened in .29 seconds. So it was significantly less than a second. So this poor gentleman had no choice but to use this appurtenance to this vessel to hold these hooks up. Now, we don't know how many times he had done it or if he'd ever done it before. We don't know. What we do know is Mr. Gambino, the manager, the maintenance, the guy in charge out there at the time, said if they would have seen him doing it that way, he would have stopped it. So they all knew that this was a dangerous way to do this. They'd been doing it and those hooks had been on there for a very long time. You're saying there wasn't any alternative. He had no alternative but to use those. Mr. Cooley, the crane operator, Mr. Gambino, they all said, those are the hooks we use because they fit between the little metal grating. They were narrow enough to fit between the little grating. Well, there weren't any other hooks available. Mr. Cooley says that. Those are the hooks that they use. Those are the ones he was supposed to use. There was evidence of a safer alternative design that you could go buy a commercial hook that did have a latch. Mr. Borson testified to that, and in his report he has a picture of one and the name of it and everything. And it's actually narrower than the one that they were actually using. So there was a safe alternative available. They just chose not to do it. The issue of Judge Fallon finding this cocktail. So there was evidence of some cocktail found in the house or something, or was this what was found in his cell? In his autopsy. There was nothing found in the house, nothing found in the house. So did that answer the question that it all went in at the same time? In other words, could he have taken one thing for pain and said this isn't working, and then taken something else for pain, and then when you do an autopsy it's all in his system? So it's a cocktail in the system, but that doesn't necessarily mean he knew in that moment that I'm mixing up a cocktail and taking a bunch of stuff, all of which is illegal, except fentanyl, which I guess is illegal no matter how you get it, even if I'm taking Motrin and my brother calls and says I'm out of Motrin, don't you take Motrin? Yeah, I got one. I guess me and my brother just committed a crime if I take that Motrin, that my brother gives me 20 milligrams of Motrin that I'm taking. But anyway, there's a cocktail in his system. Is the evidence that he would have had to mix it all at once and take it? We're calling it a cocktail. He called it a cocktail. There's evidence in the autopsy that xylosine, diazepam, and fentanyl were in his system. We don't know if they were all taken together. All we know is that was in his system, and that was all that was in his system. We also know that 10 minutes before he was found dead he was standing outside talking to his neighbor. Dr. Troxler testified that the amount of fentanyl that was in his system in the autopsy would have killed him in a matter of minutes. So all of that is, all of those facts are in evidence, and that's what we know for sure. Now, the pushing together of marine and land. Just to, so there's clarity here. What, I can't pronounce it, the Zydrug, that's a horse drug. It's, you don't, humans don't have access to it. No, you can get it from a vet. Right, from a vet.  No, not according to Dr. Troxler. No. And she was very clear, and I don't think they expected that, but she was very clear that she sees this all the time. I mean, her testimony was that she sees doctors and lawyers and people that go in for a neck surgery or a back surgery and they run out of their medication or they've stopped getting their medication from their physician and they're in such pain that they go out and they seek these things off the Internet or on the street. She sees this all the time. So it's not unforeseeable that this would happen, and that's the question. Is it possible for it to be on the Internet and look like it's legal, sort of like when you buy something from... Well... I'm just using Walmart for... Based on Mike's... If you bought something from Walmart online, you would think, probably you would think that was legal. You would think. I'm not saying it necessarily is. So is there a way that you buy something online that it looks legal, that he might not have understood it was illegal? If it said pain medication X, Y, Z, and he bought that online and then he died from it? Absolutely. But then wouldn't there have been more of that somewhere? Would there be something on his phone that would show that? I mean, wouldn't there be more evidence of that? If all he wanted was to get rid of the pain at that moment and somebody said, here, take this, then there wouldn't be any evidence of that. But to answer your question, it happens all the time. There's online stuff everywhere, and you're thinking you're buying oxycodone or oxycontin, and it's not. It's this fentanyl that's coming across the border. I mean, they're making this stuff look like... A lot of people are dying of fentanyl. They're making it look like sweet tarts and candy for kids. I mean, it's horrific that this is going on. Did they search his phone? That I don't know. Because I'm wondering, like, if he actually thought he was buying kids' candy, let's just say that, from something online. I'm not saying this is a good idea to do this, but I'm saying if he did that, I'm not sure he would know that was illegal. All we do know is Dr. Troxler said that whatever agency investigated it did an investigation and found no evidence whatsoever of any other paraphernalia, use, drugs, anything else in the house. The only thing was what was in his system. Well, if he thought he was buying candy, where's the foreseeability from the employer's standpoint that he thought he was buying candy and, in fact, he was getting a fake drug? That's pure speculation. Isn't that an intervening cause? I mean, is it foreseeable that he'll think he's taking candy that's actually laced with fentanyl, and what does that have to do with his injury if he thinks he's taking candy? Right, but, again, my saying that is... That's me saying that. That's not what was in evidence, and that's not what, you know... We do know that he was in excruciating pain, and it was ongoing. We do know that his mother was trying to get another appointment to deal with the pain. She was trying to move the appointment up to deal with the pain, and he still hadn't had his eye situation dealt with. It was going to take another two surgeries and still may not even have corrected his vision. His vision was still going to be out of line because his eye had been pushed back and down, and the socket here... I mean, there's testimony that he sneezed and he ended up with a black eye because your eye is just getting pushed out as you sneeze because this is open into the nasal cavity, and the fatty tissue around the eye was pushed into the nasal cavity, causing him to have breathing problems on that side. I mean, this man was in excruciating pain. Well, I guess the question really... Obviously, candy would be silly, but if he was buying online what he thought was pain medicine, would that be predictable? Yeah, I think it would. Isn't that actually happening a lot, that people are buying fentanyl thinking they're getting something else? Absolutely. That's the problem. People don't know what they're getting. So that would be predictable. He might have thought he was getting something for pain, and it turned out to be fentanyl, xylosine or whatever, as opposed to a high dose of aspirin or something. There's no evidence this man was suicidal. There's no evidence this man had anything other than some depression because he was not able to take care of his children because of his injuries. So he wouldn't have been trying to buy something... He wouldn't have taken something intentionally that would have killed him. I mean, that certainly was not anything in the realm of reality here. No, I understand that. I'm just trying to address the issue of he had to know it was illegal, and I guess I'm just wondering if he thought it was... if he could have thought it was legal if it was online. He could have thought it was legal. Not that I'm suggesting we should just randomly buy things online. That's not what I do, but, you know, just that question. If you have any other questions, I'll be happy to answer them, but my time is up. I just ask that you affirm the judgment as entered. Thank you. Regarding the purchase on the Internet, fentanyl cannot be purchased on the Internet. It can only be purchased or obtained through a prescription through your doctor. You can't go on Amazon's website and get fentanyl delivered to your house. This accident only happened... His death only happens because of a criminal act that's reckless and harmful and a third-party drug dealer. Are there things happening where people are buying drugs online that turn out to be fentanyl that kills them? Not that I know of. I think what you're talking about is someone picking up some drugs at a bar or a restaurant. They think they're getting cocaine, but it's cut with fentanyl. So there's no indication that there's... that there is, like, lying where you think you're getting X, but you're really getting Y, and X is legal, but Y is not. I believe, if you look at the news, that is what's happening all the time. Like, someone gets cocaine, but it's... Yeah, but X, but they're both illegal. I'm talking about where you think you're getting something legal, but in fact it turns out to be fentanyl or whatever. How would that manufacturer get fentanyl to give it to someone? I mean, fentanyl is a Schedule II. My question, there are people who can legally possess fentanyl, patients. Yes, by a prescription. Right. So if I have a relative who has fentanyl and I'm out of it and I get fentanyl from my relative, I guess that's all illegal. Yes. But if my relative is now a drug dealer, is that what you would call my relative who said, I got some of these pills by prescription, you can have one until you get to your doctor? Because you've concluded that he got this from a drug deal. It's illegal for your brother to give you a Schedule II narcotic. But if he did it, then he's the drug dealer you're talking about. In that situation, he gave you a Schedule II narcotic that wasn't prescribed to you. And I want to point out that there is testimony that it was together, he took it at once, and what Dr. Troxler said is that you cut fentanyl with xylosine, and that's on RECDOT 3114, to enhance the high. Now, also we talked about- What was the evidence he took them at the same time? I'm sorry. 3114. 3114. All the evidence showed that, sure, he did complain to his mother of pain sometimes. And like Your Honor noted, people ebb and flow during their recovery. So this case stands for a guy having one moment, one bad day, 122 days after an accident, after a successful surgery, after hiring lawyers and following suit, he has one bad day. Ten minutes before, he's out talking to his neighbors. So you're going to say that a defendant is liable in that situation for a criminal act because someone had a moment of intractable pain 122 days after an accident? It just doesn't make sense. It's unprecedented, and this case would be cited over and over again for anyone in that situation. As you can see, the court relied on no case law in rendering its opinion. This would be-this is an example of first impression. Any more questions? Thank you for your time. The court has heard the cases for the week, and they are under submission. Thank you.